IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANDREW HEGEMANN,

                Plaintiff,              OPINION AND ORDER

v.

                                       24-cv-286-wmc

BLUE CROSS BLUE SHIELD OF ILLINOIS,

                Defendant.

---

Plaintiff Andrew Hegemann brought this lawsuit claiming that defendant Blue Cross Blue Shield of Illinois ("BCBSIL") wrongfully denied him benefits due under his insurance plan. Specifically, Hegemann contends that the surgical closure of his patent foramen ovale ("PFO") in December 2022 was "Medically Necessary" as defined by his medical benefits plan with defendant (the "Plan") and, therefore, a covered procedure. Both parties have now moved for judgment as a matter of law under Federal Rule of Civil Procedure 52(a). (Dkt. ##21 and 24). For the reasons explained below, the court will deny plaintiff's motion, grant defendant's motion, and enter judgment in defendant's favor.

FACTUAL BACKGROUND[1]

A. Plaintiff's Insurance Plan

The Plan provides its members benefits for "Covered Services," which expressly excludes coverage for "[s]ervices that are not Medically Necessary." (BCBSIL_000171;

---

[1] Because this court reviews plaintiff's claim under a *de novo* standard for reasons explained in the opinion below, the court draws these undisputed facts from: the administrative record initially reviewed by defendant for each claim ("BCBSIL" dkt. #18-1); defendant's proposed findings of fact and supporting declarations (dkt. #22 and 23); and the affidavits and medical evidence plaintiff submitted in support of his motion for judgment (dkt. ##26, 27, 31, 39, and 40). *See Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 304 (7th Cir. 2020) (courts should "freely allow the parties to introduce relevant extra-record evidence and seek appropriate discovery").

BCBSIL_108.) Under the Plan, whether a service is Medically Necessary "will be based on generally accepted medical standards." (BCBSIL_000059.) BCBSIL determines whether a service is Medically Necessary based on information submitted by the insured provider and its own policies. (BCBSIL_000219-52.)

If BCBSIL determines that the service is not Medically Necessary, it issues an "Adverse Benefit Determination," such as a denial of coverage. Members have the opportunity to appeal an adverse ruling within 180 days of receiving the determination. (BCBSIL_000143-44.) To initiate an appeal, the member must follow the procedures delineated by the Plan, which include giving BCBSIL written notice of their intent to appeal, or alternatively, submitting a verbal appeal. (BCBSIL_000144; BCBSIL_000179.) In support of the appeal, a member may also present evidence, including additional medical information, to BCBSIL. (BCBSIL_000144.) Regardless, the Plan requires the member to exercise their right to pursue an administrative appeal from an Adverse Benefit Determination as a precondition to filing a lawsuit. (BCBSIL_000145.)

B. Hegemann's Treatment

In May of 2022, Hegemann suffered a stroke with an unknown cause. Over the next six months, Hegemann worked with his medical provider Aspirus to investigate the cause and appropriate treatment, including two echocardiograms. Initially, on June 9, 2022, Hegemann underwent an "Echo 2D Complete." (Dkt. #27-2, at 251.) During this exam, a "bubble study demonstrate[d] [a] right to left shunt." (*Id.*) In a follow-up appointment on November 8, 2022, Dr. Timothy Logemann noted the test's abnormal

bubble study and remarked that the details of "exactly how much and where [were] not really relayed." (*Id.* at 349-50.)

Based on these results and a suspicion that a PFO may have been the cause of Hegemann's stroke, Dr. Logemann then ordered a Transesophageal Echocardiogram ("TEE") (*Id.*), which provides the most detailed information about the anatomy and size of a PFO. (Dkt. #39-1.) Hegemann's TEE found a PFO with a bidirectional shunt and no apparent atrial septal defect ("ASD"). (Dkt. #27-2, at 230.) With this additional information, Dr. Marcus Sublette concluded that a PFO closure procedure should be done for secondary stroke prevention. (*Id.* at 209.) The procedure was then performed on December 8, 2022. Further, Hegemann was informed by Aspirus that his insurance coverage had been pre-approved. (Hegemann Aff., dkt. #26, at ¶ 4). Unfortunately, Drs. Logemann and Sublette acted without obtaining a guarantee of coverage under the Plan.[2]

### C. Hegemann's Insurance Claims

After Hegemann's PFO closure, two separate insurance claims were submitted to BCBSIL: (1) a claim from Aspirus Cardiology for $18,667.00 for the surgery itself (the "Aspirus Cardiology Claim"); and (2) a claim from Aspirus for $43,896.70 for the surgical charges, supplies, laboratory services, medical examination, medication, and use of a recovery room (the "Aspirus Hospital Claim"). (BCBSIL_000025-32; BCBSIL_001582-91.) BCBSIL applied its medical policy SUR707.024, "Closure Devices for Patent

---

[2] Defendant does not deny that Hegemann was informed that his PFO closure procedure was pre-approved, but denies that Aspirus ever initiated a pre-approval process for the surgery with BCBSIL. Additionally, Hegemann has not attested that defendant ever represented to him that the procedure would be covered. By accepting these facts, the court draws no conclusions as to whether Aspirus should be estopped seeking payment from plaintiff for his procedure.

Foramen Ovale and Atrial Septal Defects" ("BCBSIL's PFO Closure Policy") to determine if Hegemann's PFO closure was Medically Necessary. (BCBSIL_000219-52.) Under that Policy, a PFO closure may only be considered Medically Necessary if the member meets all of the following criteria:

> a. Between 18 and 60 years of age; AND
> b. Diagnosed with patent foramen ovale with a right-to-left interatrial shunt confirmed by echocardiography with at least one of the following characteristics:
> > i. PFO with large shunt, defined as >30 microbubbles in the left atrium within three (3) cardiac cycles, after opacification of the right atrium; OR,
> > ii. PFO associated with atrial septal aneurysm on transesophageal examination: septum primum excursion >10 mm; AND
> c. Documented history of cryptogenic ischemic stroke due to a presumed paradoxical embolism, as determined by a neurologist and cardiologist following an evaluation to exclude any other identifiable cause of stroke, including large vessel atherosclerotic disease and small vessel occlusive disease; AND,
> d. NONE of the following are present:
> > i. Uncontrolled vascular risk factors, including uncontrolled diabetes or uncontrolled hypertension; OR,
> > ii. Other sources of right-to-left shunts, including an atrial septal defect and/or fenestrated septum; OR,
> > iii. Active endocarditis or other untreated infections; OR,
> > iv. Inferior vena cava filter.

(BCBSIL_000219-20.)

### 1. The Aspirus Cardiology Claim

On December 27, 2022, BCBSIL issued an Explanation of Benefits ("EOB") denying coverage for the Aspirus Cardiology Claim because it needed additional information from Aspirus before it could make a coverage determination. (BCBSIL_000025-32.) For that reason, on December 29, 2022, BCBSIL asked Aspirus to

4

provide "the patient history with previous procedures preoperative-echo report procedure report for date of service" for December 8, 2022, the date of Hegemann's PFO closure. (BCBSIL_000275.) In January 2023, Aspirus sent BCBSIL Hegemann's records generated on the date of service, including notes that echocardiograms had been performed, but the results were absent. (BCBSIL_000349-72.) Over the next nine months, BCBSIL made more requests for the results of Hegemann's echocardiogram on the date of Hegemann's procedure. (BCBSIL_000477; BCBSIL_000560; BCBSIL_000588.) Because BCBSIL specifically asked for those narrow results, Aspirus's responsive documents were limited to those generated on the date of Hegemann's PFO closure and did not include his June or November echocardiogram results. (BCBSIL_000478-517; BCBSIL_000561-86; BCBSIL_000587-612; BCBSIL_000650-707.) Moreover, having been provided no echocardiogram results supporting Hegemann's need for PFO closure, BCBSIL denied Hegemann's claim.

Hegemann received notice of this denial in June 2023. (Dkt. #18-2, at 25.) His follow up with Aspirus also failed to resolve the dispute. (*Id.*) On October 10, 2023, therefore, Hegemann contacted BCBSIL telephonically and verbally to appeal the denial of coverage on this claim without supplying any further documents to support his appeal. (BCBSIL_000203.) On October 20, 2023, Hegemann's appeal was denied because a review of his medical records failed to demonstrate that the PFO procedure was Medically Necessary as defined by BCBSIL's PFO Closure Policy. (*Id.*)

### 2. The Aspirus Hospital Claim

On January 6, 2023, BCBSIL issued an EOB also denying coverage for the Aspirus Hospital Claim because it needed additional information from Aspirus before it could make a coverage determination. (BCBSIL_001582-91.) Like the Aspirus Cardiology Claim, BCBSIL asked Aspirus to "provide requested records of patient history with previous procedures and patient history and physical and pre-operative echo report . . .," this time providing a date "range" of 12/8/2022 - 12/8/2022. (BCBSIL_000435.) Aspirus's responses to BCBSIL's initial and follow-up requests included records generated on the requested date, but again did not include Hegemann's earlier echocardiogram results. (BCBSIL_000437-76; BCBSIL_000520-59; BCBSIL_000613-49; BCBSIL_000708-42.)

As a result, on December 1, 2023, BCBSIL sent Hegemann an EOB and denial letter, explaining that the clinical documentation failed to demonstrate medical necessity because they did not show results of an echocardiogram confirming a large volume of blood moving from the right side of the heart to the left due to a hole in the heart. (BCBSIL_000743-48.) This denial was confirmed in a follow-up letter sent to Hegemann on July 9, 2024. Hegemann was also advised in both denial letters of his right to appeal this decision.

### D. Records Produced in Litigation

This lawsuit was initiated on May 1, 2024. Following an extension, BCBSIL was granted until December 13, 2024, to file the administrative record. On December 13, 2024, Hegemann's counsel requested permission to include additional documents to the administrative record, indicating that some may be duplicative. The additional documents

were extensive and included the results of Hegemann's echocardiograms from June 9 and November 15, 2022.

After reviewing the administrative record and Hegemann's TEE from November 15, 2022, BCBSIL's Medical Director, Dr. Ruby Bendersky, again concluded that Hegemann's results did not establish the procedure was Medically Necessary under BCBSIL's PFO Closure Policy. (Declaration of Ruby Bendersky, M.D., dkt. #23, at ¶¶ 5, 6, & 8.)

Plaintiff also introduced into the record three articles discussing when practitioners *should* recommend PFO closure to their patients. The first article is titled "Cryptogenic Stroke and Patent Foramen Ovale" and was published in a 2018 issue of the Journal of American College of Cardiology (the "2018 Article"). (Dkt. #31-1.) The authors of this article encouraged all patients who have no other likely source of a stroke, aside from a PFO, to at least be recommended PFO closure. (*Id.*) The second article is titled "Guideline Updates Needed: Closure Devices to Prevent Recurrent Stroke in Patients With Patent Foramen Ovale" and was published in a 2024 issue of the Journal of the American Heart Association (the "2024 Article"). (Dkt. #31-2.) The author of this article recommends that the three, major PFO treatment guidelines (SCAI, American Academy of Neurology, and American Heart Association Stroke Council) all be updated to reflect new, best evidence. (*Id.*) The final article is titled "Patent Foramen Ovale Management for Secondary Stroke Prevention: State-of-the-Art Appraisal of Current Evidence" and was originally published in November 2023 in the Journal of the American Heart Association (the "2023 Article"). (Dkt. #39-1.) The authors of this article included a "[s]uggested diagnostic algorithm for patent foramen ovale diagnosis and patient selection for patent foramen ovale (PFO) closure" that suggests patients who have a PFO confirmed though a

7

TEE bubble study undergo PFO closure if they are in the "Possible" or "Probable" PASCAL (PFO-associated stroke causal likelihood) classification.[3] (*Id.*)

OPINION

Plaintiff contends that defendant wrongfully denied him coverage for his PFO closure procedure, arguing that his echocardiograms demonstrate that the procedure was Medically Necessary within the meaning of the Plan. Defendant argues that plaintiff is barred from recovering for the Aspirus Hospital Claim for failure to exhaust his administrative remedies and to meet his evidentiary burden of demonstrating his entitlement to benefits under the Plan.

## I. Exhaustion

Although ERISA does not require administrative exhaustion as a prerequisite to suit, "[the Seventh Circuit has] interpreted ERISA as requiring exhaustion of administrative remedies as a prerequisite to bringing suit under the statute." *Schorsch v. Reliance Standard Life Ins. Co.*, 693 F.3d 734, 739 (7th Cir. 2012) (quotation omitted). However, courts may excuse failure to exhaust administrative remedies where there is a lack of meaningful access to review procedures, or where pursuing internal plan remedies would be futile. *Id.* (quotation omitted). Here, plaintiff acknowledges his failure to appeal the denial of the Aspirus Hospital Claim. However, he argues this failure should be excused because

---

[3] According to the 2023 Article, an individual is classified as "Possible" if they have a "large shunt (>20 to 30 bubbles, depending on the trial), ASA (midline or total shift), or both, [or] (2) risk of paradoxical embolism (RoPE) score, dichotomized into 7 to 10 versus 0 to 6." An individual is classified as "Probable" if they have a (1) "large shunt (>20 to 30 bubbles, depending on the trial), ASA (midline or total shift), or both, and (2) risk of paradoxical embolism (RoPE) score, dichotomized into 7 to 10 versus 0 to 6."

appealing the Aspirus Hospital Claim would have been futile, especially after the Aspirus Cardiology Claim appeal had already been denied.

For plaintiff to come within the futility exception he "must show that it is *certain* that [his] claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision." *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir. 1996) (emphasis added). Because his two claims involved the same procedure, were denied for identical reasons, and his appeal of the first denial had already been rejected, plaintiff argues that defendant was certain to deny any appeal of the second benefit denial.

Somewhat disingenuously, defendant disagrees, arguing that plaintiff does not fit into this exception because his argument "is based on doubt, not certainty." (Dkt. #37 at 5.) However, the cases cited by defendant are readily distinguishable, involving plaintiffs who, for various reasons, either did not seek *any* appeal after an initial claim denial or had advanced a second claim based on different facts. *See Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1238 (7th Cir. 1997) ("The fact that [defendant] administers both claim denials and administrative appeals is not enough to constitute futility."); *Univ. of Wisconsin Hosps. & Clinics Auth. v. Aetna Health & Life Ins.*, No. 15-CV-283-BBC, 2015 WL 5123734 (W.D. Wis. Sept. 1, 2015) ("If it is not enough to show that the same individual or entity is making the initial decision and deciding the appeal, then a conclusory decision is not enough either."); *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647 (7th Cir. 1996) ("[Plaintiff] herself argued that her wrongful termination claim was so different from [her] benefits claim."). In contrast, plaintiff's hospital and cardiology claims in this case arose from the same facts, were denied for identical reasons, and already had one appeal denied.

Defendant also argues that futility is inapplicable in this case because plaintiff relies on echocardiogram results that could have been included in an appeal. However, because plaintiff followed up with Aspirus regarding the denial, prompting them to provide further documentation to defendant ahead of his first appeal, plaintiff reasonably believed that defendant had full access to his records and that a second appeal stemming from the same procedure, which had already been denied, would certainly be denied. Accordingly, the court will examine whether plaintiff was entitled to benefits on both claims.

## II. Merits

In denying benefits initially, defendant did not have plaintiff's echocardiogram results. However, the record has now been supplemented to include these results, and defendant admits that they should have been considered in making its initial determinations. With new-found access to plaintiff's echocardiogram results, the next question is whether these results entitle plaintiff to benefits. Ordinarily, that question would be for defendant to determine *after remand for further review* under its definition of Medically Necessary. However, since the general rule that "a denial of benefits challenged under [29 U.S.C.]

§ 1132(a)(1)(B) is to be reviewed under a *de novo* standard," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), *and* both parties agree that defendant's denial should be reviewed *de novo*, the court will review the record independently to determine whether plaintiff has demonstrated by a preponderance of the evidence that he is entitled to benefits under the Plan. *See Ruttenberg v. U.S. Life Ins. Co. in City of New York, a subsidiary of Am. Gen. Corp.*, 413 F.3d 652, 663 (7th Cir. 2005) (Under *de novo* review, a party

"seek[ing] to enforce benefits under the policy . . . bears the burden of proving his entitlement to contract benefits."); *see also Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc.*, 852 F.3d 105, 112-13 (1st Cir. 2017) (On *de novo* review, "an ERISA beneficiary who claims the wrongful denial of benefits bears the burden of demonstrating, by a preponderance of the evidence, that [they] were in fact entitled to coverage.").

In determining plaintiff's eligibility under the Plan, the court must "employ federal common law rules of contract interpretation." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643-44 (7th Cir. 2007) (citing *Life Ins. Co. of North America v. Von Valtier*, 116 F.3d 279, 283 (7th Cir.1997)). Under these rules, the court will "interpret the terms of the policy in an ordinary and popular sense, as would a person of average intelligence and experience, and construe all plan ambiguities in favor of the insured. Plan language may only be deemed ambiguous where it is subject to more than one reasonable interpretation." *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

There is no dispute that the Plan expressly excludes coverage for services that are not Medically Necessary, nor that a decision on whether a service meets this definition is to be based on generally accepted medical standards. (BCBSIL_000059.) Instead, the parties' disagreement turns on whether plaintiff's PFO closure procedure fits within that definition, with the burden of demonstrating entitlement to this benefit resting on plaintiff. *Ruttenberg*, 413 F.3d at 663.

In support of his claim that his PFO closure procedure was based on generally accepted medical standards, plaintiff primarily relies on the 2018, 2023, and 2024 Articles, which generally recommend PFO closures for patients under age 60 with unexplained

11

strokes. However, these articles do not provide the weight of authority or substance that plaintiff claims. To begin, the articles only provide *recommendations* and *suggestions* for an updated PFO closure policy, rather than purporting to articulate generally accepted medical standards and giving them that status would exceed their self-proclaimed purpose. (Dkt. #31-1, at 8-9 (*advocating* for multidisciplinary cryptogenic stroke teams to recommend PFO closure to all patients who have a stroke from no other likely source); dkt. #31-2, at 4 ("*Proposed* Updated Recommendation"); dkt. #39-1 ("*suggested* diagnostic algorithm") (emphasis added)). In particular, plaintiff's attempt to characterize the 2024 Article as an "update" to the American Heart Association guidelines goes too far. Indeed, not only does the 2024 Article advocate for a change to existing guidelines, but the first footnote emphasizes that "the opinions expressed in [the] article are not necessarily those of the editors or of the American Heart Association." Dkt. #31-2 at 1.

Next, plaintiff fails to offer any evidence demonstrating that these articles have been accepted into mainstream practice since being published, or even that they contradict defendant's PFO Closure Policy. To the contrary, it is evident from these articles that evaluating the size of a PFO's shunt is still important in assessing the necessity for its closure. *See* dkt. #31-1, at 8 ("Enhanced reasons for PFO Closure: Large PFO"); dkt. #31-2, at 4 (current recommendations from major guideline sources acknowledge a lower likelihood of benefit from PFO closure for patients with a small shunt); dkt. #39-1 (making PASCAL classification determinations based on shunt size measured by the number of micro bubbles consistent with defendant's PFO Closure Policy). Moreover, while plaintiff emphasizes the 2023 Article's assertion that "[b]ubble counts have been removed from the inquiry because they are difficult to quantify and technically challenging" (dkt. #38, at 9),

that same article still uses microbubble counts to measure PFO shunt sizes and associated recurrent stroke risk.  (Dkt. #39-1, at 9.)

Finally, contrary to plaintiff's statement "that closing the hole in [his] heart would provide up to a 90% chance to prevent further strokes" (dkt. #38, at 3), the studies proffered by plaintiff indicate that a PFO closure would put him at a *higher* risk of recurrent stroke and development of late atrial fibrillation.  Specifically, while advancing the benefits of closure for patients with a "Probable" or "Possible" PASCAL classification, the 2023 and 2024 Articles both state that an "Unlikely" PASCAL classification was associated with a net harm from closure.  (Dkt. 31-2, at 2; dkt. 39-1, at 6.)  Relevant here, patients have an Unlikely PASCAL classification unless they have a large shunt -- defined as the appearance of more than 20 microbubbles in the left atrium within 3 cardiac cycles after opacification of the right atrium.  (Dkt. #39-1, at 2.)  As for plaintiff's two echocardiograms, the first test found a right-to-left shunt of unknown size while the second found a bidirectional shunt.  Applying either result, plaintiff would have an Unlikely Pascall classification, which even crediting the results of the three studies is associated with net harm from closure, not a net benefit.

Beyond these articles, plaintiff offers two, additional facts to support his assertion that his PFO closure was "Medically Necessary" as defined by the Plan.  First, plaintiff highlights that the procedure was recommended to him by his doctors after finding no other likely cause for his stroke.  However, the Plan states that recommendations from a health care provider are insufficient alone to establish that a service is Medically Necessary.  Regardless, ruling out other causes of a patient's stroke is just one of the three requirements for coverage under defendant's PFO Closure Policy, along with being between ages 18 and

60 and having a PFO meeting certain metrics. Second, plaintiff suggests that his PFO closure must have been Medically Necessary because otherwise it would violate Wisconsin's medical malpractice laws, which prohibit the performance of medically unnecessary procedures. (Dkt. #38, at 1-5.) However, the issue before this court is whether plaintiff's procedure was Medically Necessary within the meaning of the Plan, *not* whether plaintiff's procedure was medically unnecessary in the context of Wisconsin's medical malpractice law.

Without further evidentiary support, the remaining question is whether a PFO closure is Medically Necessary within the meaning of defendant's PFO Closure Policy itself. Specifically, that policy considers a PFO closure Medically Necessary when an echocardiogram confirms the presence of a PFO with a large right-to-left interatrial shunt, defined by >30 microbubbles in the left atrium within three cardiac cycles, after opacification of the right atrium. (BCBSIL_000219-20.) Here, plaintiff had two echocardiograms before undergoing his PFO closure. Unfortunately, neither satisfied defendant's PFO Closure Policy. On June 9, 2022, during his Echo 2D Complete, a bubble study demonstrated a right-to-left shunt. However, this study did not determine the size of the shunt -- a requirement to determine medical necessity under defendant's PFO Closure Policy. (*Id.*) On November 15, 2022, during plaintiff's TEE, color Doppler and bubble studies identified a PFO with a bidirectional shunt. Because this echocardiogram revealed a bidirectional shunt, as opposed to a right-to-left shunt, it is not considered Medically Necessary under defendant's PFO Closure Policy.

With no echocardiograms demonstrating eligibility under defendant's PFO Closure Policy or evidence that the Policy itself falls outside generally accepted medical standards,

14

plaintiff has not demonstrated entitlement to benefits under the plan. Accordingly, the court must reluctantly grant defendant's motion and deny plaintiff's motion for summary judgment despite what seems a draconian result should Aspirus insist on payment of a supposedly preapproved surgery.

ORDER

IT IS ORDERED that:

1) Defendant's motion for judgment (dkt. #21) is GRANTED.

2) Plaintiff's motion for judgment (dkt. #24) is DENIED.

3) The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 9th day of March, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge